UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 91-8175
_____

JESUS SALAS, AGUSTIN NEGRETE and BENJAMIN MENCHACA,

Plaintiffs-Appellants,

VERSUS

SOUTHWEST TEXAS JUNIOR COLLEGE DISTRICT, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(June 24, 1992)

Before GOLDBERG, DUHÉ and BARKSDALE, Circuit Judges.

BARKSDALE, Circuit Judge:

At issue in this Voting Rights Act § 2 case is whether the plaintiff Hispanic voters, who constitute a registered voter majority in the challenged at-large district, have met their burden of establishing that use of the at-large system, as opposed to single member districts, results in their "hav[ing] less opportunity than other members of the [district's] electorate to participate in the political process and to elect representatives of their choice". 42 U.S.C. § 1973(b); **Thornburg v. Gingles**, 478 U.S. 30, 65 (1986). Because we hold that the district court's findings, including that white (Anglo) bloc voting is not legally significant, are not clearly erroneous, we **AFFIRM**; but we do so "on somewhat different reasoning than the district court employed."

*Monroe v. City of Woodville*, 881 F.2d 1327, 1328 (5th Cir. 1989), *modified on reh'g*, 897 F.2d 763 (5th Cir.), *cert. denied*, __ U.S. __, 111 S. Ct. 71 (1990).

I.

The challenged Southwest Texas Junior College District (District) covers all of Zavala and Uvalde counties and most of Real County, Texas, an area of roughly 3,400 square miles. Its Board has seven members, elected at large. They serve six-year staggered terms and are elected to numbered posts.[1] To be elected, a candidate must win a majority of the votes cast.

Hispanics comprise approximately 63% of the 36,000 (approximate) population of the three counties from which the District is drawn, and about 57% of the voting age population.[2] And, according to the Texas Secretary of State's July 1990 Voter Registration Statistical Report, 53% of the registered voters in the three counties in which the District is located have Spanish surnames. Although there is some doubt about the accuracy of the Hispanic population and voting age population statistics, the

---

[1] The District instituted a place system in 1970. "A numbered-post system requires a candidate to declare for a particular seat on a governmental body. The candidate then runs only against other candidates who have declared for that position. The voters then have one vote for that seat. The system prevents the use of bullet, or single shot, voting." *Campos v. City of Baytown*, 840 F.2d 1240, 1242 n.1 (5th Cir. 1988), *cert. denied*, 492 U.S. 905 (1989).

[2] This case was tried in 1990, and the total Hispanic population and voting age population figures are based on the 1980 census. The district court found, however, that the District's total population has remained relatively stable since 1980.

- 2 -

parties do not dispute that Hispanics constitute a slight majority of the registered voters in the District.[3]

Pursuant to the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 *et seq.*, Hispanic voters filed suit in March 1988 against the District and its trustees.  A two-day trial was held in November 1990; and in late February 1991, the district court entered detailed, exacting, and comprehensive findings and conclusions.  It found that the plaintiffs had not demonstrated legally significant white bloc voting and entered judgment for the defendants.

The district court made the following findings of fact, undisputed on appeal, concerning the District's election history (but, as discussed *infra*, these findings do not reflect the election of two Hispanics over incumbents in May 1992):

> In the forty-four years of the Board's existence, there have been only twenty-three persons elected to the Board.
>
> The evidence shows that only two Hispanics[, including Mr. Ritchie,] have ever been elected or appointed to the Board of Trustees.[4]
>
> For the first twenty-four years of the [District's] existence, all elections for the Board were uncontested.
>
> In the past twelve years, there has been only one contested election for the Board.  There was a

---

[3]    The district judge found the evidence to that effect reliable.

[4]    Plaintiffs dispute that Mr. Ritchie is Hispanic.  He testified that he considers himself to be Hispanic and has Hispanic heritage. Ritchie was defeated by an Hispanic candidate in May 1992, as discussed *infra*.

contested election in 1984[5] and there were eleven contested elections between 1970 and 1978.[6] Thus, in the history of the [District], there have been only thirteen contested elections and in each case the incumbent won.

In 1974 and 1976, an Anglo challenger ran against an Anglo incumbent. In both instances, the incumbent won.

In ten instances, Hispanic candidates ran against Anglo incumbents. In each case, the incumbent won. In one election, an Hispanic challenger ran against an Hispanic incumbent. The Hispanic incumbent won.[7]

---

[5] Josue Garza testified concerning his unsuccessful 1984 campaign for trustee. He opined that the large district size made election difficult for candidates running at large. The District elicited testimony regarding his unsuccessful election history, including that the only time he had won office was in an uncontested election.

[6] Between 1970 and 1978 the Hispanic party *La Raza Unida* exercised political power in the area comprising the District. *La raza* means "the race" or "the people". The political impact of *La Raza Unida* diminished after 1978; and by the time of the Josue Garza campaign in 1984, association with the party was perceived as a political liability.

[7] Subsequent to oral argument, the District submitted the results of the May 1992 elections for two trustee positions. Those results would alter several of the district court's factual findings (including number of contested elections, number of Hispanics elected, and success of Hispanic challengers against Anglo incumbents). For each position, a Spanish surnamed challenger defeated an incumbent. At least one of the incumbents was Anglo; the other was E. W. Ritchie, whom plaintiffs claimed to be Anglo, *see* note 4, *supra*. We simply note these facts; they do not affect "our review of the [district] court's conclusions". *Monroe v. City of Woodville*, 881 F.2d 1327, 1329 n.2 (5th Cir. 1989), *modified on reh'g*, 897 F.2d 763 (5th Cir.), *cert. denied*, __ U.S. __, 111 S. Ct. 71 (1990). On the other hand, they do deflate appellants' assertions in their affirmative and reply briefs that "[t]he proof of the pudding is the fact that no Mexican American candidate has ever been able to defeat an Anglo opponent", and that "[t]he stark fact is that no Mexican American has ever defeated [an] Anglo in a contested race".

- 4 -

There has been only one runoff in the history of the District, in which the candidate, an Anglo, who won by a plurality in the first election, carried a majority in the second.

At trial, plaintiffs presented evidence of a strong correlation between race and voting in the District. It is undisputed here that cohesion exists among Hispanic voters, that elections are racially polarized, and that Anglos and Hispanics engage in bloc voting. Although there was some testimony that Anglos and Hispanics coalesce around distinct sets of issues, there was also testimony that the Board is not political and that campaigns are not issue-driven.

Plaintiffs offered evidence on practical inhibitors to Hispanic voting, including the effect of dual registration, "soft" voting rolls that include residents who have moved,[8] and the migrant population within the District. However, it was not established that these phenomena impact Hispanic voters more frequently than Anglos.[9] Although a procedure exists for removing the names of persons who have moved from the voting rolls, the parties dispute its effectiveness.

[8] Several witnesses offered anecdotal testimony concerning persons listed twice on the rolls (dual registration) or persons who remain listed despite the fact that they have moved.

[9] The district court found: "There were no studies or other credible evidence presented that measured the comparative rate of these phenomena by ethnic group. ... Although there was anecdotal evidence regarding persons registering and then moving, there were no studies to confirm or measure this phenomenon. ... Although there was testimony that as many as ten percent of the voters on the registration [rolls] had moved, plaintiffs' witnesses were able to identify only about one percent in precincts with which they were familiar."

The plaintiffs contended in district court that the absence of migrant workers within the District at election time is a significant factor in Hispanic voters' inability to elect their preferred candidates. They introduced a report prepared in 1976 -- 14 years before trial -- by the Governor's Office of Migrant Affairs (GOMA), which lists, as of 1976, approximately 8,500 persons as migrants within the three-county area.[10] It stated that migrants typically leave the District in March, April, and May, and return in September, October, and early November.

The district court questioned the GOMA report's accuracy and probativeness, noting, for example, that it includes in its count all migrant family members, not just persons eligible to vote; the estimate of 8500 migrants includes those who did any migrant work in the five years before 1976 and who may have done such work for only one day; and, the GOMA report was based on data compiled from the 1970 census and predicted a stable migrant population for only five to ten years -- that is, until 1981-86.[11] Finally, as the district court noted, plaintiffs presented no evidence on the percentage of migrants registered to vote. Accordingly, it is unclear to what extent the absence of migrant workers from the

[10] The preface to the population figures contains the following disclaimer: "The following estimates should be taken for their face-value as projected estimates having restricted statistical testworthiness."

[11] There was contradictory testimony concerning whether migrant work was more prevalent in 1990, the time of trial, than in the mid-1970's. Trustee Flores testified that it was less prevalent; former Commissioner Cardona, that it was more. Plaintiffs introduced no figures from the 1990 census concerning the level of migrant population in the District.

District during an election means an absence of Hispanic registered voters. Plaintiffs' expert admitted: "I don't know that we have the hard data that says what the political behavior of migrants [is] in the studies that we have before us."

The plaintiffs also contended in district court that, although Hispanics represent a majority of registered voters in the District, more Anglos than Hispanics actually vote in District Board elections. They introduced a study, based on, among others, the 1984 and 1986 elections, which showed that more Anglo voters usually turned out and that their votes generally constituted the majority of those cast. The district court had "difficulty drawing any conclusions or inferences from" the study, however, because of errors it contained.[12]

As discussed *infra*, the district court made findings on relevant factors such as no discrimination against Hispanics by the District, literacy and other education comparisons, and poverty level comparisons. In its conclusions of law, it applied **Thornburg v. Gingles**, albeit construing it too narrowly in some respects, as also discussed *infra*, and held, *inter alia*, that, "[w]here the protected group constitutes a majority of the registered voters in an election district, [then: (1)] any Anglo bloc voting that might exist is not legally significant"; and (2) "the use of an at-large

---

[12]    The defendants examined some of the elections depicted in the study. As the district court noted, for each election in which defendants recalculated the data, the results had to be modified to increase the percentage of votes cast by Hispanics and to decrease Anglo vote percentages. Also, the study erred in counting persons with common Hispanic surnames as Anglo voters.

system is not dilutive".  In so holding, it cited ***Perea v. Town of***
***Pecos City***, No. P-83-CA-22 (W.D. Tex. April 20, 1984) (pre-***Gingles***:
discussed in note 14, *infra*) and "dictum" from ***City of Woodville***.
It also held that "[t]o the extent that at-large systems are
dilutive, it is because they submerge minority groups in a district
dominated by the majority".  In holding against the plaintiffs, the
district court made the following "ultimate finding":

> Although there is evidence that Hispanics have been underrepresented on the [District] Board, this Court is hesitant to intervene when those same Hispanics could readily solve this problem by simply running candidates and turning out to vote. While the Court is cognizant of the history of discrimination that has occurred in the area, the evidence presented at trial demonstrated that Hispanics have been able to get elected to offices in political units within the [District] when significant Anglo support was required.  Finding that plaintiffs enjoy the same "opportunities [as] other members of the electorate to participate in the political process and to elect candidates of their choice," this Court enters judgment for defendants.

## II.

The Hispanic voters contend that their registered voter
majority status in the District does not immunize the District from
a § 2 attack by that majority; and that, in ruling on a § 2 claim
involving such factors, the district court must still consider the
totality of circumstances, as opposed to denying relief solely
because the plaintiffs cannot satisfy the three preconditions
established in ***Gingles*** for § 2 cases challenging multimember
districts.[13]  Maintaining that the district court did not consider

---

[13]    As discussed *infra*, one of the district court's conclusions of law was that "[t]he failure to establish any of the [three]

- 8 -

the totality of circumstances, the Hispanic voters contend that this case must be remanded for that purpose. Concomitantly, they charge the district court with failing to consider properly the evidence they presented, including on the question of racially polarized voting, and assert that its findings of fact were insufficient under Fed. R. Civ. P. 52 standards set by this court, because they were not sufficiently specific and detailed and failed to state why some evidence was not considered. In short, they contend that the district court's findings were clearly erroneous -- the standard of review for § 2 cases, as discussed in part II.B.

A.

We first consider whether plaintiffs, as members of a registered voter majority class, are precluded, as a matter of law, from bringing a vote dilution claim. We hold that they are not. Our decision in **Monroe v. City of Woodville** arguably rendered the same holding. In that multimember district case, this court focused on plaintiffs constituting a majority of the district's population and held, in part: "Unimpeachable authority from our circuit has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution.... Such a case is not ... precluded as a matter of law." 881 F.2d at 1333. *Here, however, Hispanics constitute not only a sizable population majority, but also a registered voter majority*.

---

Thornburg preconditions is fatal to the plaintiffs' case and precludes the necessity of considering the Zimmer factors or other proof. Overton v City of Austin, 871 F.2d 529, 538 (5th Cir. 1989)."

We must decide whether they fail, as a matter of law, in claiming that an at-large district can illegally dilute their vote in such a circumstance. This is an issue of first impression in our circuit.[14] Needless to say, constituting a registered voter majority is far more significant in a voting rights case than simply being a population majority. This notwithstanding, as discussed below, a protected group -- even when it is the registered voter majority -- may seek relief in a vote dilution case. Whether it can obtain relief is, of course, a question of proof, as discussed in part II.B.2.

Because this is a case of first impression, we replow quite familiar voting rights ground, in order to establish a firm and sure bedding for laying the "totality of circumstances" path that we must follow in order to reach our destination. The path is not long, but it must be straight and sure. It travels over, and touches, many obvious basic, and quite sensitive, bedrock national principles and issues. Many of the battles that helped clear this ground were fought long ago; others, in the not too distant past. The memory of them is most painful, but we are equally mindful of our limited role as we make this journey.

---

[14] In **Perea v. Town of Pecos City**, No. P-83-CA-22 (W.D. Tex. April 20, 1984), decided before **Gingles**, the court denied a § 2 challenge brought by Mexican American voters, who were a registered voter majority in Reeves County, Texas. Op. at 5, 13. The court reached its conclusion based on a consideration of the various **Zimmer**, or Senate Report, factors, now incorporated into the § 2 "totality of the circumstances" analysis, as discussed *infra*. *Id.* at 8-12. It held that the challenge was in part an attempt to achieve proportional representation. *Id*. at 13.

In ***Zimmer v. McKeithen***, 485 F.2d 1297 (5th Cir. 1973) (en banc), *aff'd sub nom*. ***East Carroll Parish School Board v. Marshall***, 424 U.S. 636 (1976), this court considered whether "an at-large scheme [could] work a dilution of black voting strength where blacks, though constituting a minority of registered voters, comprise a majority of the total population of the parish." 485 F.2d at 1300. We held that it could, because "[t]he legal standards announced by the Supreme Court in ... White v. Regester [, 412 U.S. 755 (1973)] admit of no distinction on the basis of size of population alone." ***Id***. at 1303.[15] ***Zimmer*** is the above-referenced "[u]nimpeachable authority from our circuit ... reject[ing] any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution." ***City of Woodville***, 881 F.2d at 1333.

The answer turns, in part, on what kind of "minority" the Voting Rights Act protects, a national racial or language minority, or a numerical minority of voters in the jurisdiction at issue. The plain text of the statute, as affirmed by case law, makes clear that the Act is concerned with protecting the minority in its capacity as a national racial or language group.

Section 2 of the Voting Rights Act, 42 U.S.C. § "1973(a)[,] protects the right to vote of both racial and language minorities."

---

[15]    In ***White***, the Supreme Court had affirmed a finding of Hispanic vote dilution in Bexar County, Texas, even though Mexican-Americans in that county constituted a population majority. *See* ***Graves v. Barnes***, 343 F. Supp. 704, 733 (W.D. Tex. 1972) (three judge court), *aff'd in relevant part sub nom.* ***White v. Regester***, 412 U.S. 755 (1973).

*Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988), *cert. denied*, 492 U.S. 905 (1989). Likewise, *Gingles* states that § 2(a) concerns "member[s] of a protected class of racial and language minorities." 478 U.S. at 43. As noted, see also, *City of Woodville*, 881 F.2d at 1333. Section 2(a) provides in part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title ....

42 U.S.C. § 1973(a) (1992). Section 1973b(f)(2) protects the voting rights of "member[s] of a language minority group" from denial or abridgment by the same means listed in § 1973(a). The "class of citizens protected by subsection (a)", § 1973(b), is those persons whose vote is diluted based on their membership in a protected racial or language minority class, rather than in a voting group less populous in the district than the white majority.

This distinction is vividly portrayed in the Act's legislative history. The Voting Rights Act was passed in 1965 to effectuate the guarantees of the Fifteenth Amendment.[16] H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965) (Rep. No. 439), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2439; *Chisom v. Roemer*, __ U.S. __, 111 S. Ct. 2354, 2362 (1991). Congress was attempting to remedy "the systematic exclusion of Negroes from the polls that characterizes

_____

[16] That Amendment, enacted in 1870, provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

- 12 -

certain regions of this Nation."  Rep. No. 439, 1965 U.S.C.C.A.N. 2440.  It sought to combat such discriminatory devices as literacy tests and poll taxes.  *Id.*, 1965 U.S.C.C.A.N. 2443, 2444, 2451. The Act was aimed at measures that dilute the voting strength of groups because of their race, not their numerical inferiority.[17]

In 1975, Congress extended the Voting Rights Act to cover jurisdictions where language minorities reside.  S. Rep. No. 295, 94th Cong., 1st Sess. 8 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774; *see* **United States v. Uvalde Consol. Indep. Sch. Dist.**, 625 F.2d 547, 550 (5th Cir. 1980), *cert. denied*, 451 U.S. 1002 (1981).  To "race or color", it added "or in contravention of the guarantees set forth in section 4(f)(2)" of the Act.[18]  **Chisom**, __ U.S. __, 111 S. Ct. at 2362 & n.18.  The amendments' purpose was to remedy existing voting discrimination against citizens from non-English speaking environments.  S. Rep. No. 295 at 24, 30-31, 1975 U.S.C.C.A.N. at 790, 797.

The Senate Judiciary Committee analogized discrimination faced by language minorities to what blacks had experienced in the South prior to enactment of the 1965 Act:

---

[17]  In a report entitled "Joint Views of 12 Members of the Judiciary Committee Relating to the Voting Rights Act of 1965", made a part of S. Rep. No. 162, 89th Cong., 1st Sess. (1965), those Senators agreed in "recogniz[ing] the necessity to eradicate once and for all the chronic system of racial discrimination which has for so long excluded so many citizens from the electorate *because of the color of their skin*."  1965 U.S.C.C.A.N. 2540 (emphasis added).

[18]  As noted, § 4(f)(2) extends voting rights protections to "member[s] of a language minority group".

> Language minority citizens, like blacks throughout the South, must overcome the effects of discrimination as well as efforts to minimize the impact of their political participation. The State of Texas, for example, has a substantial minority population, comprised primarily of Mexican Americans and blacks. Evidence before the Subcommittee documented that Texas also has a long history of discriminating against members of both minority groups in ways similar to the myriad forms of discrimination practiced against blacks in the South.

S. Rep. No. 295 at 25, 1975 U.S.C.C.A.N. at 791.[19] Congress was concerned about economic reprisal and intimidation against language minorities, and specifically Mexican Americans, for exercising the franchise; "[u]nderlying many of the abuses", the Judiciary Committee stated, "is the economic dependence of these [language] minorities upon the Anglo power structure." *Id*. at 26, 1975 U.S.C.C.A.N. 792-93.[20]

In amending the Act in 1975, Congress was concerned about protecting language minorities, as it had blacks, as racial or ethnic groups that had experienced appreciable prior discrimination in voting. As an example of the existing vote dilution experienced

---

[19] The Committee noted that Mexican Americans suffered from many of the same barriers to political participation confronting blacks. *See* S. Rep. No. 295 at 30, 1975 U.S.C.C.A.N. at 796 ("`invidious discrimination and treatment in the fields of education, employment, economics, health, politics and others.'" (Quoting *Graves v. Barnes*, 343 F. Supp. 704, 728 (W.D. Tex. 1972), *aff'd in relevant part sub nom. White v. Regester*, 412 U.S. 755 (1973)); *id*. at 35, 1975 U.S.C.C.A.N. at 801 (comparing voting discrimination problems faced by blacks pre-1965 to those that would justify requiring preclearance to avoid vote dilution of language minorities).

[20] As an example, the Committee mentioned reports that "some Mexican Americans in Uvalde, Texas are afraid their welfare checks will be reduced because of their political activity." S. Rep. No. 295 at 26, 1975 U.S.C.C.A.N. at 792-93.

by these groups, the Senate Judiciary Committee discussed use of at-large school districts in Texas:

> The at-large structure, with accompanying variations of the majority run-off, numbered place system, is used extensively among the 40 largest cities in Texas. And, under state statute, the countless school districts in Texas elect at-large with an option to adopt the majority run-off, numbered place system. These structures effectively deny Mexican American and black voters in Texas political access in terms of ... representation.

S. Rep. No. 295 at 27-28, 1975 U.S.C.C.A.N. 794; *see Uvalde Consol.*, 625 F.2d at 556.

The 1982 amendments to § 2, which added subsection b and the "results" language to subsection a, were adopted in response to the Supreme Court's plurality holding in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), and clarify that a results test, rather than an intent requirement, would govern in § 2 vote dilution cases. *See Chisom*, 111 S. Ct. at 2362-63; *Gingles*, 478 U.S. at 35, 43-44. The Act's goal remained what it had been in 1965: to eliminate voting discrimination on the basis of race or ethnicity. S. Rep. No. 417, 97th Cong., 2d Sess. 4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 181. In commenting on the limitations of the *Bolden* intent test, the Senate Judiciary Committee said:

> [I]f an electoral system operates today *to exclude blacks or Hispanics from a fair chance to participate*, then the matter of what motives were in an official's mind 100 years ago is of the most limited relevance. The standard under the Committee amendment is whether *minorities* have equal access to the process of electing their representatives.

*Id.* at 36, 1982 U.S.C.C.A.N. at 214 (emphasis added).

- 15 -

Likewise, case law, including that already discussed, has emphasized that access to the political process, aside from population statistics, is the criteria by which a court determines illegal or unconstitutional vote dilution. As noted, this court decided in *Zimmer* that whether at-large districts unconstitutionally diluted minority votes could not be decided "on the basis of size of population alone." 485 F.2d at 1303.[21] Judge Goldberg has written for our court: "[I]t is not population but access to the political process that determines whether an interest group enjoys the full vigor of its political rights." *Wallace v. House*, 515 F.2d 619, 631 (5th Cir. 1975), *vacated mem.*, 425 U.S. 947 (1976). As the three judge court stated in *Graves v. Barnes*, 343 F. Supp. 704, 733 (W.D. Tex. 1972), *aff'd in relevant part sub nom. White v. Regester*, 412 U.S. 755 (1972), "[the term] `minority' has traditionally been used in Civil Rights cases to denote a racial or social group of people, not a numerical percentage." A panel of the Eighth Circuit, albeit in a vacated opinion, agreed with this viewpoint in *Whitfield v. Democratic Party*, 890 F.2d 1423, 1428 (8th Cir. 1989), *opinion vacated and district court judgment aff'd mem. by an equally divided court*, 902 F.2d 15 (8th Cir. 1990) (en banc), *cert. denied*, __ U.S. __, 111 S. Ct. 1089 (1991):

---

[21]    This court also stated: "[W]e cannot sanction the view that minorities are to be exposed and subject to apportionment schemes otherwise constitutionally infirm because the equal protection clause can be watered down on the basis of population statistics alone." 485 F.2d at 1304.

> The inquiry [into whether blacks should be considered a minority for § 2 purposes] does not stop with bare statistics. Section 2 is not restricted to numerical minorities but is violated whenever the voting strength of a traditionally disadvantaged racial group is diluted. ... We conclude, as a matter of law, that a numerical analysis of the voting age population in a particular geographic area does not automatically preclude application of section 2 to a challenged voting practice used in that area.

*See also* **id**. at 1434 (Hanson, J., concurring) ("Congress ... has mandated that no state voting procedure can be allowed to stand which `results' in the dilution of *the voting strength of a traditionally disadvantaged racial group* in `any state' or `subdivision' thereof." (Emphasis added.)).[22]

In **Gingles**, the question of whether a population majority, voting age population majority, or registered voter majority divested a racial or language minority ("protected class") of its protected status was not presented, because in that case, black voters were "a distinct population and registered-voter minority in each challenged district." 478 U.S. at 38. The Court assumed in its discussion that the protected class, while consisting of "members of geographically insular racial and ethnic groups", **id**. at 64, was, at the same time, the numerical minority; likewise, the white, numerically superior group was the majority. *See **id**.* at 48 ("the majority, by virtue of its numerical superiority"). And,

---

[22]  *But compare* **Jeffers v. Clinton**, 730 F. Supp. 196, 252 (E.D. Ark. 1989) (three judge court) (Eisele, J., concurring and dissenting) ("[A]s long as there are no legal barriers to registration or voting, then it is my view that 50-plus percent [voting age population] is a `majority' and 50-minus percent [voting age population] is a `minority'."), *aff'd mem.*, __ U.S. __, 111 S. Ct. 662 (1991).

while the Court discussed at several points the submergence of *minority voters* in a *white majority*, it is unclear whether it was discussing the paradigm of a vote dilution case or the facts of the particular case before it. *See, e.g.*, **id**. at 46 (discussing submergence of black votes in a white majority); **id**. at 51 (to establish white bloc voting, "the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives"); **id**. at 68 ("vote dilution through submergence in a white majority").

As stated, just as this court has rejected a *per se* rule that population majority groups cannot experience vote dilution through use of an at-large system, we hold that a protected class that is also a registered voter majority is not foreclosed, as a matter of law, from raising a vote dilution claim. First, the Voting Rights Act protects racial and language minorities; it does not focus on the vote dilution a group experiences merely because it is the numerical minority. Second, the same reasons counseling that population majorities may experience vote dilution suggest that the same may occur where the protected class is a voting age population majority, or even a registered voter majority. Minority groups (protected classes) do not lose the protection of the Voting Rights Act when they are no longer population or registered voter minorities in a political subdivision; the Act is directed at their status as a national racial or language minority. It is conceivable that an election structure could dilute a registered voter majority's vote or that low turnout, among a group registered

in high percentages, could result from a Voting Rights Act violation. Obviously, plaintiffs must prove it. And, third, the Supreme Court has instructed that,

> in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the `*totality of the circumstances*' and to determine, based `upon a searching practical evaluation of the "past and present reality,"' whether the political process is equally open to minority voters. `"*This determination is peculiarly dependent upon the facts of each case*"'.

*Gingles*, 478 U.S. at 79 (quoting S. Rep. No. 417, *supra*, at 30 and *Rogers v. Lodge*, 458 U.S. 613, 621 (1982)) (emphasis added). *See also* **Westwego Citizens for Better Gov't v. City of Westwego (Westwego III)**, 946 F.2d 1109, 1120 (5th Cir. 1991).

The Court's instruction to employ a case-by-case approach counsels against a *per se* rule that a protected class, that is also a registered voter majority, cannot experience vote dilution through use of an at-large district. As noted, this conclusion is consistent with our court's statement in **City of Woodville** that

> [a]s *de jure* restrictions on the right to vote mercifully recede further into the historical past, we should expect it to be increasingly difficult to assemble a **Zimmer**-type voting rights case against an at-large electoral district where a minority-majority population exists. Such a case is not, however, precluded as a matter of law.

881 F.2d at 1333.

### B.

To hold that plaintiffs, even though a registered voter majority, may bring a vote dilution claim only begins our inquiry. As stated in § 2(b), in order to establish a § 2(a) violation, plaintiffs must show "that the political processes leading to

- 19 -

nomination or election ... are not equally open to participation by members of [the protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Section 2(b) provides in full:

> A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b) (underlining added). As discussed *infra*, in a multimember or at-large challenge, where the protected class is also the registered voter majority, the "totality of circumstances" analysis becomes even more significant. That analysis consists of an application of the earlier referenced *Zimmer*, or Senate Report, factors. They include factors adversely affecting the protected class's right to participate in the election process, such as: discrimination, and its effects in areas such as education, health and employment; voting practices or procedures; and prior election success. *Gingles*, 478 U.S. at 36-37, 44-45; *see East Jefferson Coalition v. Parish of Jefferson*, 926 F.2d 487, 491 (5th Cir. 1991). For example, in addition to the earlier quoted findings on

electoral success, some of the totality of circumstances findings in this case were:

> While in the past there has been segregation in the public schools and discrimination in the area against Hispanics, the [District] has never been segregated and there was no evidence of discrimination against Hispanics by the [District].
>
> According to the 1980 Census of Population, 41.6% of the Hispanic population of the three county area over the age of twenty-five were functionally illiterate or had completed less than four years of formal education. Anglos, on the other hand, showed only a 4.1% functional illiteracy rate in the same age group.
>
> Only 20.5% of the Hispanics were graduates of high school, as opposed to more than 64% of the Anglos. Further, 81% of the residents of the [District] with college degrees were Anglo.
>
> Almost 37% of the Hispanic families in the three county area were below the poverty level as compared to only 11% of the Anglo families. Further, just over 50% of the Hispanic families, but only 16.8% of the Anglo families were below 125% of the poverty level.

We must now determine whether the alleged vote dilution is attributable to the challenged election practice -- use of an at-large district.[23] The Supreme Court has instructed that:

> Minority voters who contend that the multimember form of districting violates § 2, must prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates.
>
> While many or all of the [totality of circumstances] factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not

---

[23] At-large districts are not *per se* unlawful. *E.g., **Gingles***, 478 U.S. at 48; ***Zimmer***, 485 F.2d at 1304.

> impede the ability of minority voters to elect representatives of their choice. Stated succinctly, a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group. ... These circumstances are <u>necessary preconditions</u> for multimember districts to operate to impair minority voters' ability to elect representatives of their choice for the following reasons. First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. ... Second, the minority group must be able to show that it is politically cohesive. ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances ... -- usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 48-51 (citations and footnote omitted; underlining added); *see also* **East Jefferson**, 926 F.2d at 491. As discussed below, a critical question in this case is whether the plaintiffs must prove all three preconditions before the district court considers whether, in light of the "totality of circumstances", the challenged practice is dilutive.

We review under the clearly erroneous standard the district court's findings concerning (1) the three *Gingles* preconditions, (2) the factors relevant to the totality of circumstances analysis; and (3) vote dilution (*the ultimate finding*). **Westwego III**, 946 F.2d at 1118 & n.13. It is well to revisit the holding in *Gingles* on the standard of review, part of which was quoted earlier:

> We reaffirm our view that the clearly-erroneous test of Rule 52(a) is the appropriate standard for appellate review of a finding of vote dilution. As both amended § 2 and its legislative history make clear, in evaluating a statutory claim of vote dilution through districting, the trial court is to consider the "totality of the circumstances" and to determine, based "upon a

- 22 -

searching practical evaluation of the `past and present reality,'" whether the political process is equally open to minority voters. "`*This determination is peculiarly dependent upon the facts of each case,'" and requires "an intensely local appraisal of the design and impact" of the contested electoral mechanisms*. The fact that amended § 2 and its legislative history provide legal standards which a court must apply to the facts in order to determine whether § 2 has been violated does not alter the standard of review. As we explained in **Bose** [**Corp. v. Consumers Union of U.S., Inc.**, 446 U.S. 485 (1984)], Rule 52(a) "does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Thus, the application of the clearly-erroneous standard to ultimate findings of vote dilution preserves the benefit of the trial court's particular familiarity with the indigenous political reality without endangering the rule of law.*

478 U.S. at 79 (citations omitted; emphasis added). And, as is more than well established, a finding of fact is clearly erroneous "only when although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." **Westwego III**, 946 F.2d at 1118.

### 1.

The district court found for plaintiffs on the first two **Gingles** preconditions, Hispanics could constitute a majority in a single member district and are politically cohesive; and the District does not contest those findings. Therefore, the only precondition in issue is the third -- whether white bloc voting exists that *usually* operates to defeat the protected class's preferred candidate. In considering this precondition, especially

where the minority is also a majority under one or more criteria, it is well to remember that "[t]he determinative question for a Section 2 claim ... is not whether whites generally vote as a bloc, but rather, *whether such bloc voting is legally significant*." **City of Woodville**, 881 F.2d at 1332 (emphasis added).

As quoted in full in note 13 *supra*, the district court concluded that unless all three **Gingles** preconditions were established, it was not necessary to consider "the <u>Zimmer</u> factors or other proof", citing **Overton v. City of Austin**, 871 F.2d 529, 538 (5th Cir. 1989). In **Overton**, however, as in other decisions by this court stating that same rule, the protected class was not a population, or other, majority. *See, e.g.*, **Westwego III**, 946 F.2d at 1116, 1120; **East Jefferson**, 926 F.2d at 491. On the other hand, in **City of Woodville**, this court noted that this third **Gingles** precondition may not be the appropriate test for analyzing vote dilution claims in a jurisdiction with a protected class that is a population majority. This is because in **Gingles**, as noted, the Court was dealing with a case where black voters were a distinct *population minority* and where the evil they complained of was submergence in a white multimember district. **Gingles** discussed the third precondition against this factual backdrop:

> In establishing this last circumstance [legally significant white bloc voting], the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.

478 U.S. at 51; *see also* **City of Woodville**, 881 F.2d at 1333. Whether this third precondition "was intended to address" a vote

dilution claim where the protected class is the majority, is, this court noted, "a matter of speculation among several possible interpretations." *Id.*[24] This court did not linger long over this question, noting immediately the overriding totality of circumstances question:

> The issue is, however, ultimately irrelevant because irrespective of [*Gingles'*] meaning in a case like this, *Zimmer's holding clearly was not abandoned when Congress amended Section 2.*
>
> Because we have already concluded that a [*Gingles*] vote dilution claim is foreclosed here by lack of black political cohesion, and we conclude in the following discussion that a *Zimmer* totality of circumstances dilution claim was not proven by appellants, we need not opine further on this puzzling aspect of [*Gingles*].

*Id.* at 1333-34 (emphasis added). The *City of Woodville* court had stated earlier that "[t]he [*Gingles*] threshold analysis does not replace the totality of circumstances inquiry, *the ultimate determination* to be made under Section 2." *Id.* at 1330 n.4 (emphasis added).

In any event, for a case of the type presented here, *Gingles* offers guidance on how the third precondition is to be applied. The Court noted that "[t]he amount of white bloc voting that can generally `minimize or cancel' [minority] voters' ability to elect representatives of their choice ... will vary from district to district according to a number of factors". 478 U.S. at 56. Among

---

[24] Another circuit has used the third *Gingles* prong to analyze whether plaintiffs could make out a vote dilution claim where whites were a registered voter minority. *See Meek v. Metropolitan Dade County*, 908 F.2d 1540, 1547 (11th Cir. 1990), *cert. denied*, __ U.S. __, 111 S. Ct. 1108 (1991).

these factors is "the percentage of registered voters in the district who are members of the minority group".  *Id*.  The Court concluded that whether the evidence of racial bloc voting "rises to the level of legal significance under § 2" will depend on the factual circumstances of each case and that, accordingly, "there is no simple doctrinal test for the existence of legally significant racial bloc voting."  *Id*. at 57-58.

We, as did the *City of Woodville* panel, find the third precondition difficult to apply in a case such as this.  But, like that panel, we stay fixed on, and follow, the controlling totality of circumstances path and do not tarry long, or wander off, in pursuit of trying to fashion some alternative third (white bloc voting) precondition for instances where the protected class is, in fact, the majority.[25]  It is useful, however, to recall that a court analyzes the legal significance of racial bloc voting in order to

_____

[25]    For example, the Supreme Court established the three preconditions for mounting a multimember challenge because, if the plaintiffs lacked the potential to elect representatives in a smaller, single member district, then such alternative, single member districts, would not constitute relief, nor would the at-large district be cause of § 2 injury.  *See, e.g.*, *Gingles*, 478 U.S. at 48-51, 48 n.15, 50 n.16.  The District contends that the at-large structure is to the Hispanic voters' advantage, asserting that, because they are a voter majority, they can elect candidates of their choice to each and every position on the District's Board. But, because the Hispanic voters are such a majority, and because of their arguable, if not proven, lack of electoral success, then another factor is arguably inhibiting, if not preventing, such success.  Under various complex theories, it can be contended that all three *Gingles* preconditions are applicable when the protected class is a population, or other, majority; under other equally complex theories, that the third precondition, concerning *usual* effectiveness of white bloc voting, is not applicable.  But, the plain command of § 2, to follow the totality of circumstances, brings this complex and intriguing puzzle to a merciful end; and we resume our journey on its path.

answer a more ultimate question, namely, "the impact of the contested structure or practice on minority electoral opportunities `on the basis of objective factors.'" *Gingles*, 478 U.S. at 44. Concomitantly, it is the plaintiffs' burden, in order to justify relief, to "prove that the use of a multimember electoral structure operates to minimize or cancel out their ability to elect their preferred candidates." *Id*. at 48.

Underlying these functions of the court and the plaintiffs in a multimember district vote dilution case is an inquiry into causation -- whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives. Likewise, the Supreme Court, in measuring legally significant white bloc voting, aims at determining whether it is racial voting patterns, along with other objective factors, rather than some other set of causes, that explain the lack of electoral success of voters within the protected class. Accordingly, in analyzing legally significant white bloc voting in a case where the protected class is also a population, registered voter, or other majority, the third *Gingles* precondition requires an inquiry into the causal relationship between the challenged practice and the lack of electoral success by the protected class voters. First, is voting polarized along racial lines? Second, given that the protected class voters are the registered voter majority in the district, is their inability to elect their preferred representatives caused primarily by racial bloc voting or, instead, by other circumstances which the Act does not redress?

Concerning racial polarization in voting, the district court found:

> The analysis of the electoral evidence plaintiffs presented indicates a very high degree of support by Hispanics for Hispanic candidates. That is to say that a Hispanic candidate running against an Anglo opponent always receives the majority of the Hispanic vote.

It did not make a finding concerning Anglo bloc voting, but the District concedes it in its brief here. As noted, the district court cited **Town of Pecos City** (pre-**Gingles**; used totality of circumstances analysis) and "dictum" from **City of Woodville** to conclude that "[w]here the protected group constitutes a majority of the registered voters in an election district, any Anglo bloc voting that might exist is not *legally significant*." (Emphasis added.) But, as also noted, its subsequent, *ultimate finding* was that the true cause for lack of Hispanic electoral success was not unequal electoral opportunity, but rather the failure of Hispanic voters to take advantage of that opportunity: "[T]his Court is hesitant to intervene when those same Hispanics could readily solve this problem by simply running candidates and turning out to vote."

Accordingly, notwithstanding the district court's absolute underlying holding, its opinion should not be read to hold that, as a matter of law, Anglo bloc voting cannot ever be legally significant whenever the protected class also constitutes a registered voter majority. As discussed, neither of the cases it cited, **City of Woodville** and **Town of Pecos City**, so held. And, as the Supreme Court has instructed, determining the legal significance of white bloc voting is a factual inquiry that will

- 28 -

vary with the circumstances of each case. *Gingles*, 478 U.S. at 57-58.

Although a registered voter majority class faces an obvious, difficult burden in proving that their inability to elect results from white bloc voting, they are not precluded, as a matter of law, from seeking to prove such a claim. In deciding such a majority's claim, the district court looks to the totality of circumstances. In doing so, it need not base its finding on any particular *Zimmer* factor or configuration of factors. "No one of the factors is dispositive; the plaintiffs need not prove a majority of them; other factors may be relevant." *Westwego III*, 946 F.2d at 1120. *See id.* n.16 (listing the factors); *Gingles*, 478 U.S. at 45. Notwithstanding some of its conclusions of law, as discussed above, we disagree with the Hispanic voters' contention that the district court failed to properly consider, or make findings on, the totality of circumstances factors in this case, as discussed below. In the alternative, and assuming *arguendo* that the district court did not proceed beyond a conclusion that failure to satisfy the third *Gingles* precondition ended the dispute, we hold that the findings of fact by the district court satisfy the totality of circumstances test and are, therefore, sufficient to uphold its judgment, as also demonstrated below.

2.

In attempting to meet this burden of proof under the totality of circumstances, the protected class -- that is also some form of majority -- may attempt to prove, for example, that its registered

voter majority is illusory, as plaintiffs attempted here. They introduced evidence of "soft" voting rolls that included residents who had moved away and double listings for the same voter. However, as the district court found, plaintiffs failed to provide credible studies. Their evidence consisted mainly of anecdotal testimony in which witnesses only identified a small number of inaccuracies in voter lists per precinct. The plaintiffs also failed to prove that "soft" voting rolls implicated Hispanics more heavily than Anglos. The district court's findings concerning the voting rolls were not clearly erroneous.

As another example, plaintiffs might be able to prove that a registered voter majority was illusory, because of practical impediments to voting. In this case, they attempted to prove that a significant portion of the Hispanic population was unavailable to vote on the date of the election, because of migrant work. However, the district court did not credit that evidence, because none was presented that reliably proved (1) the extent of the migrant population at the time of the trial;[26] or (2) what percentage of migrant workers are registered voters. Plaintiffs also failed to prove the inadequacy of absentee voting procedures to allow migrant workers absent from the District to vote. The district court's findings that the Hispanic registered voter majority was not illusory are not clearly erroneous.

---

[26] As noted, the plaintiffs relied on the 1976 GOMA study that projected stable migrant populations only until 1981-86, whereas the trial was conducted in 1990.

As another example, plaintiffs could conceivably prove that, despite a registered voter majority, low turnout at elections was the result of prior official discrimination. *E.g.*, **Graves v. Barnes**, 343 F. Supp. at 733 ("the *reason* that the voter participation among the Mexican-Americans is so low is that their voting patterns were established under precisely the same sort of discriminatory State actions that we have already found both relevant and condemnatory with regard to the Dallas Blacks" (emphasis in original)). Plaintiffs would face a difficult burden of proof; but, as this court noted in **Westwego Citizens for Better Gov't v. City of Westwego (Westwego I)**, 872 F.2d 1201, 1212 (5th Cir. 1989), "Congress and the courts have recognized that `political participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination'". (Quoting **Gingles**, 478 U.S. at 69). Here, plaintiffs introduced evidence of disputed accuracy that, at some Board elections, Hispanic turnout was roughly seven percentage points below that of Anglos.[27] However, they offered no evidence directly linking this low turnout with past official discrimination. Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote. Further, the high incidence of Hispanic *registration* in the District is persuasive evidence that Hispanic voters are not deterred from participation in the political process because of the effects of

---

[27]    As noted, the district court found the statistics unreliable because of errors disclosed after appellees' analysis of the data.

prior discrimination, including unemployment, illiteracy, and low income.

Accordingly, the district court's ultimate finding that the cause of the Hispanic voters' lack of electoral success is failure to take advantage of political opportunity, rather than a violation of § 2, is not clearly erroneous.[28]

### III.

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

[28] Because we affirm, we do not reach the lawyer disqualification issue raised by the District (even assuming, in light of its failure to take a cross-appeal, that we could do so).