James C. Hill, Circuit Judge, concurred specially and filed opinion.

**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**UVALDE CONSOLIDATED INDEPEN-
DENT SCHOOL DISTRICT et al.,
Defendants-Appellees.**

No. 79–1498.

United States Court of Appeals,
Fifth Circuit.

Sept. 2, 1980.

Rehearing and Rehearing En Banc
Denied Oct. 9, 1980.

Drew S. Days, III, Walter Barnett, David Marblestone, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Jeffrey A. Davis, Houston, Tex., for defendants-appellees.

Before HILL, RUBIN and ANDERSON, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A complaint by the Attorney General, in the name of the United States, brought under the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1971, 1973 to 1973bb–1, alleges that an at-large system of electing representatives to a local school board in Texas "has been implemented with the intent and purpose of causing . . . irreparable injury to Mexican-American voters . . . by effectively and pur-

posefully precluding them from meaningful access to the political process . . . ." The district court dismissed the suit for failure to state a claim upon which relief could be granted Fed.R.Civ.P. 12(b)(6). Because we find that the complaint made allegations which, if proved, would be sufficient to warrant relief, we reverse and remand for further proceedings.

## I.

■ The case reaches us on the unsupported but not yet disproved allegations of the complaint. This initial pleading, which is required only to give notice of the claim, must be construed liberally so as to do substantial justice. Fed.R.Civ.P. 8(e). A complaint is not to be dismissed under Rule 12(b)(6) unless it appears to a certainty that no relief can be granted under any set of facts that can be proved in support of its allegations.[1]

The complaint alleges that:

the seven member Board of Trustees of the Uvalde Consolidated Independent School District is elected at-large;

approximately fifty percent of the population of the school district is Mexican-American, but Mexican-American voters' residences are concentrated in one part of the City of Uvalde;

only one Mexican-American has ever been elected to the Board of Trustees and currently no Mexican-Americans serve on the board;[2]

voting is normally along racial lines;

the Board has discriminated against Mexican-Americans in the past by operating intentionally segregated elementary schools and is unresponsive to the needs of the Mexican-American community;

as a result of the school district's election system, Mexican-Americans have less opportunity than "whites" to participate in the political process and to elect candidates of their choice to the Board;

the at-large system of electing the Board has been implemented with the purpose of causing, and is causing, irreparable injury to Mexican-American voters by denying them, in effect, meaningful access to the political process and by frustrating their right to a full, undiluted vote.

Relying on these allegations, the Attorney General sought a judgment declaring that the at-large election system violated section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and enjoining the use of that system.

Acknowledging that at-large systems of selecting voters may violate the fourteenth amendment, *see White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and, that if the complaint had been filed by an aggrieved voter, the allegations might state a fourteenth amendment claim, the district court nevertheless held that section 2 of the Voting Rights Act does not itself prohibit the maintenance of an at-large method of election for school board members,[3] and, there-

---

1. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As Professor Charles Wright says, the rule "has been stated literally hundreds of times." It "precludes final dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations that show on the face of the complaint some insuperable bar to relief." C. Wright, Law of Federal Courts, 3d ed., 322. See also 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil §§ 1215, 1216.

2. At oral argument the Assistant United States Attorney stipulated that two Mexican-Americans have recently been elected.

3. The original complaint filed by the Attorney General did not include an allegation of intentional voting discrimination. The district court dismissed that complaint, but allowed the Unit-

ed States twenty days within which to amend it. The United States did so, adding the allegation of intentional discrimination. The amended complaint was also dismissed by the district court which held, despite the intent allegation, that "the Attorney General, in the name of the United States, has no cause of action under . . . 42 U.S.C. § 1973 [section 2] when he alleges that as a result of the at-large method of election Mexican-American residents have less opportunity than do others to participate in the political process." The district court specifically noted that its decision did not affect the right of private citizens to bring an action. The district court also rejected the United States' other bases for the claim; however, on appeal the United States rests solely on the contention that the complaint states a cause of action under section 2.

fore, that the Attorney General had no basis for the suit. Before this court the school district contends that the district court's conclusion should be affirmed both because section 2 does not reach at-large districting schemes and because a school board is not a "State or political subdivision" covered by section 2. We address each argument in the light of Supreme Court and Fifth Circuit interpretations of the Voting Rights Act. In doing so, we do not repeat the discussion of its history and purposes set forth in many prior decisions. *See, e. g., United States v. Board of Commissioners of Sheffield, Ala.,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978); *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). However, we point out that the single statute contains a number of different provisions each with a different objective, that for its comprehension critical examination of each section is essential and that the reader cannot, therefore, assume that each of the sections is designed to reach the same objective or is necessarily to be read in the same manner.[4]

## II.

Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, which was amended in 1975 to include the words italicized below, provides:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, *or in contravention of the guarantees set forth in section 4(f)(2)* [42 U.S.C. § 1973b(f)(2)].

The guarantees of section 1973b(f)(2) [section 4(f)(2) of the amended Act] assure against any denial or abridgment of the right to vote because the voter is a member of a language minority group.[5] The Attorney General is authorized to sue to prevent violations of section 2.[6]

4. We set out very briefly, for the reader who is unfamiliar with the basic anatomy of the statute, a summary of the Act.

The Voting Rights Act of 1965 enacted several different provisions to enforce the right to vote without discrimination based on race or color. Section 2, 42 U.S.C. § 1973, forbids any state or political subdivision to deny or abridge the right of a citizen to vote on the basis of race or color. Section 3, 42 U.S.C. § 1973a, sets forth judicial remedies to be utilized by a court whenever the Attorney General or an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendments. Section 4, 42 U.S.C. § 1973b, forbids the adoption of any test or device to deny or abridge the right to vote on the basis of race or color in "any" federal, state "or local election." Section 4, however, applies only to certain geographical areas: those states that maintained a voting test or device on November 1, 1964, and in which less than 50% of the persons of voting age residing in the state were registered to vote or actually voted in the presidential election of November, 1964; and, in addition, to "any political subdivision with respect to which such determinations have been made as a separate unit."

Section 5, 42 U.S.C. § 1973c, provides that, whenever a state or political subdivision designated pursuant to section 4 seeks to change a voting practice, it must obtain clearance for that change from either the United States District Court for the District of Columbia or the Attorney General. "This so-called 'preclearance' requirement is one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a 'substantial departure . . . from ordinary concepts of our federal system'; its encroachment on state sovereignty is significant and undeniable." *United States v. Board of Commissioners of Sheffield, Ala.,* 435 U.S. 110, 141, 98 S.Ct. 965, 984, 55 L.Ed.2d 148 (1978) (Stevens, J., dissenting, joined by Burger, C. J., and Rehnquist, J.) (footnote omitted).

There is a marked difference between the coverage of sections 2 and 5. Section 5, with its stringent preclearance requirements, is limited to geographical areas designated under section 4 of the Act as having a history of discrimination; section 2 applies nationwide.

5. "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group." 42 U.S.C. § 1973b(f)(2).

6. *See* 42 U.S.C. § 1973j(d). There is also a general authorization for the Attorney General to sue to redress violations of the Voting Rights Act of 1870, 42 U.S.C. § 1971, which safeguards the right of all citizens to vote at any election,

The statute applies to any "standard, practice, or procedure" that "den[ies] or abridg[es]" the right of language minority groups to vote. Section 5 of the Act, 42 U.S.C. § 1973c, which prohibits certain jurisdictions from enacting any new "standard, practice or procedure with respect to voting" unless advance clearance is obtained, has been held to include changes from multiple single district to at-large election systems. *See Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). However, section 5 is more broadly remedial than section 2 and reaches all changes in voting laws and not simply voting practices that deny or abridge the right to vote. Thus, some members of the Supreme Court have reasoned that the broad interpretation given to section 5 may not justify a similarly broad reach for section 2. "[Section 2] does not deal with every voting standard, practice, or procedure, but rather is limited to voting procedures that deny someone the right to vote." *Dougherty County Board of Education v. White,* 439 U.S. 32, 51, n.4, 99 S.Ct. 368, 379, n.4, 58 L.Ed.2d 269 (1978) (Powell, J., dissenting, joined by Burger, C. J., and Rehnquist, J.) These *Dougherty* dissenters became a plurality in *City of Mobile v. Bolden,* —— U.S. ——, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) when they joined in an opinion by Justice Stewart holding that the mere dilution of the voting rights of a racial group did not violate the fifteenth amendment or, consequently, section 2 of the Voting Rights Act.

The school district now asserts, on the authority of *City of Mobile v. Bolden,* that a section 2 claim is not stated by allegations of dilution of voting rights, even coupled with a claim of discriminatory purpose.

### III.

*Bolden* reversed a decision of this court holding that Mobile's at-large system of elections operated to discriminate against black voters in violation of the fourteenth and fifteenth amendments. *See Bolden v.* *City of Mobile,* 571 F.2d 238 (5th Cir. 1978). Our opinion had held that, if the challenged election laws were maintained for a discriminatory purpose, they violated both the fourteenth and fifteenth amendments, and that the plaintiffs had successfully proved discriminatory motive in the district court. The Supreme Court reversed our judgment.

The *Bolden* panel had not considered the statutory section 2 claims but upheld the judgment of the district court because the districting was found to violate both the fourteenth and fifteenth amendments. The Supreme Court, however, reviewed the circuit court decision under the statute as it stood prior to the 1975 amendment. While the members of the Court were not able to agree on a majority opinion, a plurality concluded that "the sparse legislative history of [pre-amendment] § 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself." It, therefore, discussed the scope of the fifteenth amendment alone as coextensive with, as well as limitative of, section 2.

The plurality seems to conclude at one point "that the Fifteenth Amendment applies only to practices that directly affect access to the ballot" and is therefore not relevant to cases involving at-large districting. *See Bolden,* —— U.S. at ——, 100 S.Ct. at 1509 n.3, 64 L.Ed.2d at 47 (Stevens, J., concurring in the judgment) *Cf. Dougherty County Board of Education v. White,* 439 U.S. 32, 99 S.Ct. 368, 379 n.4, 58 L.Ed.2d 269 (1978) (Powell, J., joined by Burger, C. J., and Rehnquist, J.) (section 2 "is limited to voting procedures that deny someone the right to vote"). However, Justice Stewart's opinion for the plurality also includes an extensive discussion of the need for proof of "racially discriminatory motivation" in a fifteenth amendment challenge to voting laws and implies that, where minorities register and vote without hindrance, such purposeful discrimination had not been shown. *See Bolden,* —— U.S. at ——, 100 S.Ct. at

---

including specifically school district elections, without distinction of race or color. If a school board election is not covered by section 2, the Attorney General, therefore, may attempt to bring a complaint under 42 U.S.C. § 1971(c). Although the Attorney General asserted a cause of action under § 1971 below, he does not press it before us.

1517, 64 L.Ed.2d at 47 (White, J., dissenting) ("A plurality of the Court today agrees with the courts below that maintenance of Mobile's at-large system for election of city commissioners violates the Fourteenth and Fifteenth Amendments only if it is motivated by a racially discriminatory purpose.") Thus, the plurality's rejection of the fifteenth amendment and section 2 claims in *Bolden* may rest entirely upon the conclusion that no discriminatory motivation was shown.

■ The ambiguity of the plurality opinion is alleviated by the various dissents and concurring opinions, each of which indicates that in a proper case an at-large districting plan may be held to violate the fifteenth amendment and, therefore, section 2.[7] Moreover, the essential holding of this court in *Bolden*, that the fifteenth amendment prohibits purposefully discriminatory voting schemes, was approved in effect by a majority of the court. The plurality opinion focused on this requirement and appears to us to rest its conclusion that the fifteenth amendment was not violated on its finding that the "racially neutral" at-large districting was not "motivated by a discriminatory purpose." ——— U.S. at ———, 100 S.Ct. at 1497, 64 L.Ed.2d at 47.[8]

■ We are convinced that the fundamental reasoning of our decision in *Bolden,* and its companion, *Nevett v. Sides*, 571 F.2d 209 (5th Cir. 1978), survives the Supreme Court's decision intact. Thus, "a showing of racially motivated official action that infringes the right to vote is sufficient to state a cause of action." 571 F.2d at 221. Our precedent recognizes that at-large districting may result in substantial dilution of a minority vote and therefore constitute unconstitutional infringement of the right to vote if discriminatory purpose is shown. *See Nevett v. Sides; see also United States v. East Baton Rouge Parish School Board*, 594 F.2d 56 (5th Cir. 1979).

The Court in *Bolden* discussed the text of section 2 as it stood prior to the 1975 minority language group amendment, even though *Bolden* was filed after that amendment. It is evident, however, for reasons we shall now discuss, that the amendment did not weaken the conclusion we have reached.

If the fifteenth amendment includes persons of Spanish heritage and others who are members of language minority groups within the protection accorded to those identified by race or color, an interpretation that has been advocated by the Department of Justice both in this case and in the Congress,[9] then the 1975 amendment subtracted

---

7. Justice Blackmun, for example, apparently assumes such a violation in *Bolden*, but concurs in the judgment of the plurality because the relief accorded by the district court "was not commensurate with the exercise of sound judicial discretion." Justice Stevens opined that the fifteenth amendment applies in cases involving at-large districting but concluded that the constitutionality of such systems should be measured by an objective standard, rather than by focusing on motivation. Justice White felt that the evidence established discriminatory motivation and, therefore, a violation of the fourteenth and fifteenth amendments. Justices Marshall and Brennan felt that proof of discriminatory intent was unnecessary.

8. Thus, although Justice Stevens concluded that the plurality held that the fifteenth amendment does not reach at-large election systems regardless of their purpose, and that the plurality's discussion of the need for discriminatory purpose was dictum, we are inclined to accept Justice White's view that the plurality's holding rested on the requirement of discriminatory

purpose in fifteenth amendment claims. In any event, it is clear that a majority of the court believes that a fifteenth amendment claim can be made out against vote-diluting at-large districting if discriminatory purpose is proved. See footnote 7, supra. Although only Justice White appears to have wholly adopted this court's reasoning in *Bolden*, a majority appears to agree with the legal principles set forth in our *Bolden* opinion but not with their application to the evidence presented.

9. "*Section 205*

The Fourteenth Amendment is added as a constitutional basis for these voting rights amendments. The Department of Justice and the United States Commission on Civil Rights have both expressed the position that all persons defined in this title as 'language minorities' are members of a 'race or color' group protected under the Fifteenth Amendment. However, the enactment of the expansion amendments under the authority of the Fourteenth as well as the Fifteenth Amend-

nothing from practices reached by section 2, but merely extended its protection to specifically designated racial groups. In that event, the views expressed in *Bolden* apply directly to such groups. If, on the other hand, groups identifiable only by linguistic characteristics are not race or color groups, however elusive the concept of race, Congress has no fifteenth amendment authority to legislate for their protection. Because Congress's fifteenth amendment enforcement authority reaches only legislation directed against racial or color discrimination, the amendment might be considered beyond the Congress's fifteenth amendment authority.

 The fourteenth amendment is broader than the fifteenth. Its protective buckler shields all citizens of the United States from abridgment of privileges and immunities of citizens, and all persons from deprivation of life, liberty and property without due process and from denial of the equal protection of the law. Congress's power under section 5 of the fourteenth amendment clearly extends to protection of any group of persons invidiously discriminated against by state law including groups identifiable by ethnic, national origin or linguistic characteristics. Purposefully discriminatory maintenance of a vote-diluting at-large districting scheme comes within the purview of that protection. *See City of Mobile v. Bolden; White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

Whether Congress had power under the fifteenth amendment to extend protection to language minority groups we need not now decide. In taking this action, Congress invoked its fourteenth amendment charter as well. *See* 42 U.S.C. § 1973b(f); *See generally* H.R.Rep. No. 94–196, 94th Cong., 1st Sess. (1975); S.Rep. No. 94–295, 94th Cong. 1st Sess. (1975), U.S.Code Cong. & Admin.News 1975, p. 774. Thus, unlike the pre-1975 Act, the present statute is not limited to fifteenth amendment compass. We interpret its language within the wider

ment, would doubly insure the constitutional basis for the Act."

fourteenth-amendment bounds and find that it reaches any "standard, practice or procedure" instituted or maintained with the purpose of abridging the voting rights of the members of groups protected by section 2.

 Although Congress's invocation of the fourteenth amendment alone might not support a conclusion that at-large districting is a "standard, practice or procedure" forbidden by section 2, the legislative discussion preceding the amendments indicates that this was Congress's view of the substantive scope of the section 2 prohibition when it adopted the amendments, whether or not that interpretation was previously proposed. In 1975, a central concern of the Congress was the need to protect language minority groups from practices that deprived them of equal political participation. Among the catalogued abuses, Congress noted the problem of "dilution of the vote" of language minority groups by voting structures, including "the at-large structure." "These structures effectively deny Mexican-American and black voters in Texas political access . . . ." H.R.Rep. No. 94–196, 94th Cong. 1st Sess. 19–20 (1975). The Congress specially invoked fourteenth amendment authority for the extension designed to alleviate the problems faced by Mexican-American voters in exercising their votes, and the House and Senate reports specifically discuss *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), a case in which the Supreme Court determined that a Texas at-large districting plan violated the fourteenth amendment rights of Mexican-American voters. *See* H.R.Rep. No. 94–196, 94th Cong. 1st Sess. 19 (1975); S.Rep. No. 94–295, 94th Cong., 1st Sess. 25 (1975). The legislative history plainly supports the United States' position that section 2, as amended, was intended to provide the Attorney General with a means of combatting the use of at-large districting plans to dilute the Mexican-American vote.

*H.R.Rep. No. 94–196, 94th Cong., 1st Sess. 41 (1975).*

This interpretation is also supported by the structure of the amendments. The substantive protection of language minority groups was added in a separate section, § 1973b(f). That section recites Congress's concerns about the voting rights of language minority groups, the problems they have faced, the protections and prohibitions they are to receive, and the foundation of the amendments in both the fourteenth and fifteenth amendments.[10] This . suggests that Congress believed its enactment was responsive to all the concerns it expressed in the legislative history.[11]

It is evident that, whatever the scope of section 2 as a fifteenth amendment enforcement statute, its amendment in 1975 to expand its reach to fourteenth amendment violations was intended to bring within its scope allegations of purposeful discrimination in at-large election schemes.[12]

## IV.

█ The Act applies only to a "State or political subdivision." The school district argues that, while it might be considered an agency of the state or a political subdivision

were these terms used in their usual broad significance, they are used in the act as terms of art deliberately defined in a limited way so as to exclude such units as school districts.[13]

Section 14(c)(2) of the Act, 42 U.S.C. § 1973l(c)(2) states:

The term "political subdivision" shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.

The Uvalde School District is patently not a county and it does not register voters. It is certainly not a political subdivision as defined by section 14(c)(2).

However, the Supreme Court has held that this definition limits the meaning of the phrase "State or political subdivision" only when it appears in certain parts of the Act, and that it does not confine the phrase as used elsewhere in the Act.[14] In *United States v. Board of Commissioners of Sheffield, Ala.*, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), the court held that sec-

---

**10.** "The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices."

42 U.S.C. § 1973b(f)(1).

**11.** The Attorney General might have premised his suit specifically on § 1973b(f)(2). However, because § 1973 also extends protection as to the guarantees made by § 1973b(f)(2), we find no defect in the reference to that section alone.

**12.** We do not reach the question whether section 2, post-amendment, forbids mere vote dilution.

**13.** In *Wise v. Lipscomb*, 437 U.S. 535, 550, 98 S.Ct. 2493, 2502, 57 L.Ed.2d 411, 423 (1978), Justice Rehnquist, joined by Chief Justice Burger and Justices Stewart and Powell stated: "we have never had occasion to consider whether an analogue of this highly amorphous theory [of vote dilution] may be applied to municipal governments. . . . [T]he possibility of such distinctions has not been foreclosed . . . ." The decision in *Bolden* virtually forecloses the possibility that vote dilution is wrongful only when practiced by a governmental unit larger than a municipality. However, in enacting the Voting Rights Act, Congress may have deliberately refrained from action with regard to all political units because of its desire to preserve some state prerogatives in the federalist system. It is that possibility we now consider.

**14.** See n. 4, *supra*, for a discussion of the various contexts in which the phrase appears.

tion 5 of the Act, 42 U.S.C. § 1973c, which requires a "State or political subdivision" to preclear voting changes, applied to Sheffield, Alabama, a municipality that had never registered voters and a governmental unit that, therefore, was not a state, county or registration unit.

In *Sheffield* the Court concluded that, for section 5 purposes, when a state is designated for coverage, the simple word "state" refers to all political units within the designated state. It went on to say, in deliberate dicta, that a similar argument could be made to the term "political subdivision." A school board could not be separately designated for coverage under the Act, it said, but, "once an area of a nondesignated State had been determined to be covered" all state actors within "the designated political subdivisions" were embraced by section 5.

The definition of political subdivision in section 14(c), the Court reasoned, merely limits the political units that can be designated as subject to the Act's special remedial provisions when they are in a nondesignated State, and thus limits only the phrase "political subdivision" as used in section 4(b), not the term as used elsewhere in the Act. In *Dougherty County Board of Education v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978), the Court applied section 5 to a county board of education reasoning again that the board was included within the term "State."

The meaning of the term "State or political subdivision," as used in section 4(a) was considered by the Court in *City of Rome v. United States*, —— U.S. ——, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980). Section 4(a) of the Act allows a covered jurisdiction to avoid its provisions by bringing a suit to establish that it has not discriminated in the past. 42 U.S.C. § 1973b. The provision is applicable with respect to a "State or political subdivision" to which the Attorney General has applied the Act's remedial provisions. In concluding that Rome, Georgia, did not come within the term "State or political subdivision" for purposes of this "bailout" provision, the Court reasoned that the legislative history clearly allowed the

bailout option only to the State as a whole or to any political subdivisions separately designated by the attorney general as coming within the Act. Rome was under the Act because it was in a designated State. Thus, it could bail out only if the State did. The Court distinguished *Sheffield*, holding that it determined only that the reach of the term "State" in section 5 was geographic, not that a city was actually a "State," and that *Sheffield* simply held that the preclearance requirement for a covered state "reached all such changes made by political units in that State." Because the legislative history clearly prohibits bailouts by individual political units in a covered state, it precluded the City of Rome from separate bailout consideration.

Here we must determine whether the term "State or political subdivision" in section 2 is to be read, as it is in section 5, to include a school board (to which *Sheffield* and *Dougherty County* would lead us) or whether it excludes such a governmental unit (to which *Rome*, interpreting section 4(a), leads).

Section 5 is a special remedial provision designed to apply only to those areas where voting discrimination has historically been present. Section 2 applies throughout the nation. The reliance placed in *Sheffield* on the geographical significance of the term "State," and the interrelationship noted between section 4 and section 5, therefore, do not apply.

However, the purpose of the definitional limitation in section 14 is not served by reading that restriction into section 2. As we have seen, the limitation was intended to limit the political units that can be designated by the Attorney General as subject to the remedial provisions of section 4 when these subdivisions are in a nondesignated state. Moreover the 1975 amendment (unlike the original Act) partially relies on the authority of the fourteenth amendment, which reaches all action under state authority. Justice Powell, dissenting in *Rome*, commented accurately that the Court has construed identical words to have varying meanings in different situations and has

labeled the construction "protean," *Rome,* —— U.S. at ——, 100 S.Ct. at 1573, 64 L.Ed.2d 119. While the characterization may be correct, it is evident that the court has interpreted these identical terms to vary in meaning depending on the purpose of the statutory section employing them. It has been guided by function, not by an effort to achieve linguistic constancy.

Given the varying interpretations of the same words reached in *Sheffield* and *Dougherty County* on the one hand and in *Rome* on the other, the section 2 interpretative problem cannot be resolved merely by processes of definition or literal exegesis. Lexicons would not eliminate the ambiguity. Absent the limiting definition in section 14, the broad sweep of section 2 would certainly embrace school boards. The narrowing of the term "political subdivision" was adopted for a particular purpose not served by incorporating the same stricture into section 2. As Mr. Justice Brennan pointed out in *Sheffield,* [discussing section 4(a)] thus to qualify section 2, would make it inapplicable to the actions of officials at polling places in hundreds of elections throughout the nation. 435 U.S. at 120–21, 98 S.Ct. at 973–74, 55 L.Ed.2d at 159.[15]

■ In our opinion Congress intended to forbid racial, color and language minority discrimination in all of the myriad elections reached by section 2. The legislative histo-

ry of the 1975 amendments to the Act not only emphasizes the discriminatory use of at-large districting to dilute the votes of Mexican-Americans, but focuses in particular on the use of such districting plans by Texas school boards.[16] When Congress has so plainly identified a problem, and amended a statute to address it, we would overstep the bounds of the judicial prerogative to interpret arguably ambiguous language in such a manner as to hold that Congress did not intend to embrace the very predicament from which it sought to extricate the victims. Therefore, we conclude that a school board is a political subdivision for section 2 purposes.

For these reasons, we REVERSE and REMAND for proceedings consistent with this opinion.

JAMES C. HILL, Circuit Judge, concurring specially:

In Part III of his opinion, my brother RUBIN has ably attempted to resolve the conceded "ambiguity" of *Bolden,* viz., whether the Fifteenth Amendment applies to voting abuses of the sort here alleged. The entire discussion is dictum, however, because the panel—properly—rests its holding on the Fourteenth Amendment. Since the Voting Rights Act of 1965, § 2, 42 U.S.C.A. § 1973 (West Supp.1980), as reenacted in 1975, derives from the Fourteenth

---

**15.** *Mr. Justice Stevens' dissent, which was joined by Chief Justice Burger and Mr. Justice Rehnquist, in* Sheffield, *supra, suggests another meaning to the term "State," which he rejected for construction of section 5, but which does accord with the purposes of section 2. He suggested that action by the city might be considered as action of the State within the meaning of section 5. "It might be reasonable," he said "to treat the action of entities such as Sheffield, which are within the jurisdiction of a covered state, as 'state action,' just as such governmental action would be regarded as state action in a constitutional sense."* 435 U.S. at 144, 98 S.Ct. at 985, 55 L.Ed.2d at 174. *He rejected that reasoning, however, because he was convinced that the limited definition of political subdivision was intended to restrict the scope of federal power to require preclearance under section 5. This reading would make the words "or political subdivision" in section 2 redundant. We would be obliged to*

conclude either that it was included merely to emphasize the scope of the word "state" or that it was excess. This reading, however, is not implausible. *See, e. g., United States v. Saint Landry Parish School Board,* 601 F.2d 859, 866 (5th Cir. 1979).

**16.** The at-large structure, with accompanying variations of the majority run-off, numbered place system, is used extensively among the 40 largest cities in Texas. *And, under state statute, the countless school districts in Texas elect at-large* with an option to adopt the majority run-off, numbered place system. These structures effectively deny Mexican American and black voters in Texas political access in terms of recruitment, nomination, election and ultimately, representation. S.Rep. No. 94–295, 94th Cong., 1st Sess. 27–28 (1975) (emphasis supplied), U.S.Code Cong. & Admin.News 1975, p. 794.

Amendment, and since all Justices in *Bolden* agreed that that Amendment reaches multimember districts adopted "invidiously to minimize or cancel out the voting potential of racial or ethnic minorities," 100 S.Ct. at 1499 (plurality opinion), I concur in the result of Part III.

I join the remainder of the panel opinion.