Nichet SMITH and Renaldo Fowler, Plaintiffs–Appellants,

v.

SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT; Board of Directors, of Salt River Project Agricultural Improvement and Power District; James L. Diller; Howard W. Lydic; Eldon Rudd; Gilbert R. Rogers; Clarence C. Pendergast, Jr.; Fred J. Ash; James R. Marshall; Dwayne E. Dobson; Bruce B. Brooks; William W. Arnett; Mark W. Pace; Emil M. Rovey; sued in their official capacity as members of the council of Salt River Project Agricultural Improvement and Power District; Roy W. Cheatham; Clarence J. Duncan; Lester Mowry; Lawrence P. Schrader; Mario J. Herrera; Wayne A. Marietta; Kevin J. Johnson; Byron G. Williams; John E. Anderson; Lee Tregaskes; John A. Vanderwey; C. Dale Willis; Orland R. Hatch; Ben Butler; Elvin E. Fleming; Larry D. Rovey; Charles D. Copperinger; Robert L. Cook; Lloyd Lee Banning;

David Rousseau; Dan C. McKinney, Jr.; Wayne A. Hart; Michael K. Gantzel; Dale Riggins; W. Curtis Dana; Edmund Navarro; Ann M. Burton; Mario J. Herrera; William P. Schrader; Robert G. Kempton; Wayne A. Weiler sued in their official capacity as members of the Council of Salt River Project Agricultural Improvement and Power District; Members of the Board of Salt River Project Agricultural Improvement and Power District, Defendants–Appellees.

No. 95–16951.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 1996.

Decided March 24, 1997.

Timothy M. Hogan, Arizona Center for Law in the Public Interest, Phoenix, Arizona, for the plaintiffs-appellants.

Neil Vincent Wake, Bryan Cave, Phoenix, Arizona, for the defendants-appellees.

Before: FLETCHER, FARRIS, and HALL, Circuit Judges.

FLETCHER, Circuit Judge.

Nichet Smith and Renaldo Fowler ("Appellants") are African–Americans who reside within the boundaries of the Salt River Project Agricultural Improvement and Power District ("District") but do not own real property within the District. Appellants claim that the criterion of land ownership for eligibility to vote in District elections violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 ("§ 2"), because only forty percent of African–American heads-of-household within the District own homes, compared with sixty percent of white heads-of-household. The district court held that the District is not a political subdivision within the scope of § 2 and that, even if § 2 does apply, Appellants failed to demonstrate that the District's voting system violates § 2. We have jurisdiction under 28 U.S.C. § 1291. While we reject portions of the district court's decision, we affirm its judgment that Appellants have not proved their § 2 claim against the District.

## I. BACKGROUND

### A. History and Structure of the District

The District comprises 260,188 acres of land located in Maricopa County, Arizona. Together with the Salt River Valley Water Users' Association ("Association"), the District operates the Salt River Project, a federal reclamation project. The District is organized as an agricultural improvement district under A.R.S. §§ 48–2301 through 48–2475 and is a political subdivision and municipal corporation under Arizona Law. Ariz. Const. Art. 13, § 7; A.R.S. § 48–2302.

The Association was formed in 1903 to represent the landowners for whose benefit the Salt River Project was established and to develop, store, and distribute water for subscribed land. The Association is an Arizona corporation whose shareholders are the subscribing landowners. In the 1930s, the federal government and the Association developed hydroelectric generating capacity in order to subsidize with electricity revenues the cost of providing water to Association lands.

In 1937, the Association decided to take advantage of Arizona's Agricultural Improvement District Act, Ariz.Rev.Code of 1928, §§ 3467–3514; 1922 Laws Ch. 23, by organizing a district which would issue tax-exempt bonds at a low interest rate. The District's bonds would be used to refund the Association's outstanding bonds and reduce annual

interest costs to the Association's shareholders.

The Association successfully lobbied the Arizona legislature to amend the Agricultural Improvement District Act to give districts the option of acreage-based voting and to include among the districts' purposes the reduction of irrigation, drainage, and power costs to district landowners through the sale of surplus power. The Association then organized the District, encompassing within its boundaries all subscribed land. Today, the Association and District operate as alter egos. The District operates the Salt River Project's power function; the Association acts as the District's agent to operate the water delivery system.

The District provides water to 238,399.55 acres of land, including eight municipalities. Its geographical boundaries include another 74,808 acres of non-irrigable land or lands that were not subscribed into the Association. Since 1982, approximately 82 percent of the District's water system costs are financed with electricity revenues. As of April 30, 1994, the District provides power to 572,-225 customers, of whom 90 percent are residential customers and 75 percent reside within the District's geographical boundaries. By subsidizing its water operations with electricity revenues, the District is able to provide water at an average charge of $75.00 for five acre-feet. The unsubsidized cost of that amount of water would be $288.75.

The District is governed by a fourteen-member Board of Directors and a thirty-member Council. A.R.S. §§ 48–2361 to –2368. The District is divided into ten electoral divisions, each of which elects one Director and three Council members. The President and Vice–President of the Board and four additional Directors are elected at large. The District's electoral divisions and governing structure are virtually identical to those of the Association.

The Board's powers are set by statute. The Board may, *inter alia*, establish and enforce laws, rules, and regulations necessary to carry on the District's business, con-struct works for irrigation, drainage, and power, levy taxes on real property within the District, sell tax-exempt bonds, and exercise the power of eminent domain. A.R.S. §§ 48–2335, –2336, –2340, –2341(B), –2411 to –2415.

To qualify to vote in District elections, electors must own real property within the boundaries of the District as of sixty days preceding the election and possess the qualifications required of electors for state officers in Arizona. A.R.S. § 48–2309. Each elector is entitled to cast one vote per acre of land he or she owns. *Id.* § 48–2383(B). Since 1969, owners of fractional acreage are entitled to cast corresponding fractional votes. *Id.* § 48–2383(C). The at-large directors are elected on a one-person, one-vote basis by qualifying electors. *Id.* § 48–2365(D). Because electors must meet Arizona's general voter eligibility requirements, corporations, trusts, and estates are not eligible to vote. Over one-half of the District's acreage is owned by such entities; as of January 1994, only 99,863 of the District's 238,399.55 total acres can be voted. Electors need not reside within the District to vote their land in District elections. Board and Council members must own real property within the District at the time they are elected. *Id.* §§ 48–2362 to –2363.

## B. District Demographics [1]

In 1990, African–Americans comprised 3.5 percent of the population of Maricopa County. Forty-point-one percent of African–American heads-of-household owned their homes, while 60.3 percent of non-Hispanic white heads-of-household owned their homes. When home ownership (used as a proxy for land ownership due to data availability) is broken down by electoral division within the District, African–American home ownership ranges from a low of 14.9 percent to a high of 55.5 percent. Home ownership for non-Hispanic whites ranges from 51.2 percent to 73.9 percent. In no division does a greater percentage of African–Americans than whites own homes. In each biennial election since

---

1. These demographic figures are drawn from the joint stipulation of facts the parties submitted to the district court.

1980, fewer than 1 percent of eligible voters have voted in District elections.

The District has no history of racial politics and its operations do not involve racially-differentiated interests. African–Americans are represented in the District's work force in roughly identical proportion to their representation in Arizona's work force.

## C. Procedural History

Appellants are African–Americans and are registered voters in Arizona. Neither Appellant owns any real property located within the District. Appellant Fowler lives on District lands. Both Appellants purchase electric power from the District.

In Appellants' First Amended Complaint for declaratory and injunctive relief against the District, they allege that because proportionately fewer African–Americans than non-Hispanic whites residing in the District live in owner-occupied homes, the District's land ownership voting prerequisite denies African–Americans the opportunity to participate in the District's political processes and to elect representatives of their choice, and therefore violates § 2.

The District answered the complaint, but the parties then entered into a lengthy joint stipulation of facts, reserving as a question for trial only "[t]he extent, if any, and statistical significance, if any, of African–Americans within the district having a lower incidence of home ownership than non-Hispanic Whites."

The bench trial that ensued consisted primarily of expert testimony by Appellants' statistical expert, Dr. Ronald G. Faich, and the District's statistical expert, Dr. Michael A. Maggiotto, regarding the relationship, or lack thereof, between race and home ownership in the District.

Doctor Faich used the "chi-square" method to analyze the demographic data. This method uses a four-cell table to compare percentage differences between groups. Dr.

Faich measured the 60:40 ratio of white home ownership against the 40:60 ratio of African–American home ownership. The result, he testified, was "extraordinary ... the chances of finding a relationship like this between white ownership and black rentership were less than one in a million." However, Dr. Faich also testified that the chi-square test merely confirmed a result he expected; he stated that he "knew at the outset, without even calculating anything," that he would find a statistically significant relationship.

On cross-examination, Dr. Faich conceded that the chi-square method does not reveal how two variables will vary in relation to one another. He also conceded that he had not undertaken to identify and examine other variables that might contribute to home ownership in the District.

The District's expert, Dr. Maggiotto, criticized the chi-square method as simplistic and misleading. Dr. Maggiotto testified that he had analyzed the same data using a multivariate model. This model focuses on the variable of interest, here race, but also includes "theoretically reasonable and cogent explanations for home ownership that might compete with race."[2]

Dr. Maggiotto explained in detail the operation of his model. He testified that multiple regression analysis did not indicate a strong correlation between race and home ownership. On cross-examination, Dr. Maggiotto explained that his model treated race as one possible predictor of home ownership and tested whether home ownership was a function of race alone or of many factors, including race. He also stated that if forced to identify the variable with the "largest net effect" on home ownership, he would point to "persons per dwelling unit."

The district court ruled in favor of the District and against Appellants. The court adopted the parties' joint stipulation of facts and concluded that Appellants had presented no evidence of racial discrimination in Dis-

---

**2.** Dr. Maggiotto's model included ten variables: percent black, percent non-Hispanic black, percent of homes built since 1980, persons per dwelling unit, percent income over $50,000, percent retired or over age 65, percent at or below poverty line, percent living in same dwelling as five years ago, median household income, and percent owner occupancy. The first two variables represented race, the tenth was the dependent variable.

trict elections, that all persons are similarly affected by the District's water and power functions without regard to race, that the District's functions are not susceptible to or influenced by racial politics, and that even if African–Americans are disproportionately affected by the District's land ownership voting qualification, this result is not racially discriminatory. The district court also found that land-ownership-based voting reflects "Arizona's commitment to the landowners and their successors who placed their lands at risk to develop the reclamation system," and furthers important state interests and policies. Finally, finding credible Dr. Maggiotto's testimony, the district court concluded that "the observed difference in rates of home ownership between non-Hispanic whites and African–Americans is not substantially explained by race but is better explained by other factors independent of race."

The district court then announced several conclusions of law. First, the court held that § 2 does not apply to the District. Nevertheless, the court examined the merits of Appellants' § 2 claim. Noting that § 2 plaintiffs must establish that they have been denied the right to vote "on account of race or color," the court explained that some causal nexus must exist between the challenged voting practice and the claimed indicator of racial discrimination. The court rejected the notion that the statistical disparity in home ownership, standing alone, could establish a § 2 violation.

The district court found that Dr. Maggiotto's testimony adequately rebutted any inference of racial bias that the statistics might suggest. The court further found that the parties' own stipulations established the absence of actual discrimination and that Arizona's interest in landowner voting is important, not tenuous. Accordingly, the court held that, in light of the totality of the circumstances, the District's land ownership requirement does not violate § 2.

Finally, the district court asserted that applying § 2 to invalidate the District's land ownership voting requirement would be unconstitutional. In support of this conclusion, the district court stated that because the facts revealed no past or present racial discrimination in District voting, the application of § 2 would exceed Congress's authority to enforce the Fifteenth Amendment.

This appeal followed.

## II. STANDARD OF REVIEW

■ In determining whether a challenged voting practice violates § 2, the district court must examine the totality of the circumstances and "determine, based 'upon a searching practical evaluation of the past and present reality,'... whether the political process is equally open to minority voters." *Thornburg v. Gingles,* 478 U.S. 30, 79, 106 S.Ct. 2752, 2781, 92 L.Ed.2d 25 (1986) (citation omitted). This examination is intensely fact-based and localized. *Id.* (citing *Rogers v. Lodge,* 458 U.S. 613, 621, 102 S.Ct. 3272, 3277–78, 73 L.Ed.2d 1012 (1982)). Deferring to the district court's superior fact-finding capabilities, we review only for clear error its ultimate finding of no § 2 violation. *Id.* at 78–79, 106 S.Ct. at 2780–81.

■ Nevertheless, we retain the power "to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Id.* at 79, 106 S.Ct. at 2781 (citing *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984)). We therefore review *de novo* the district court's determination that § 2 does not apply to the District. *See id.* at 79, 106 S.Ct. at 2781.

## III. DISCUSSION

■ We begin with the question whether § 2 applies to the District at all.

### A.

Fifteen years ago, the District's voting system was the subject of a Fourteenth Amendment challenge. In *Ball v. James,* 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981), the Supreme Court held that the District was not subject to the Equal Protection Clause's one-person, one-vote requirement. The Court explained that "though the state

legislature has allowed water districts to become nominal public entities in order to obtain inexpensive bond financing, the districts remain essentially business enterprises, created by and chiefly benefiting a specific group of landowners." *Id.* at 368, 101 S.Ct. at 1819 (citations omitted). The Court found that the acreage-based voting system was reasonably related to the District's legitimate statutory objectives, particularly since acreage reflected the relative risks each landowner incurred and "the distribution of the benefits and the burdens of the District's water operations." *Id.* at 371, 101 S.Ct. at 1821.

In this case, the district court relied heavily on *Ball* in finding the District outside § 2's reach. However, in so holding, the court misinterpreted both *Ball* and § 2. *Ball* involved the District's acreage-based voting under A.R.S. § 48–2383, not the land ownership requirement of A.R.S. § 48–2309, which is at issue here. In *Ball,* the Court held that the District "does not exercise the sort of governmental powers that invoke the strict demands of the [one-person, one-vote principle]." 451 U.S. at 366, 101 S.Ct. at 1818. The Court did not address whether the District's electoral system discriminates on the basis of race.

It is that issue which implicates § 2. Congress enacted the Voting Rights Act, 42 U.S.C. §§ 1971–1974e, to implement the Fifteenth Amendment and "rid the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). Section 2, as amended in 1982, prohibits the use by "any State or political subdivision" of any voting qualification, prerequisite to voting, or standard "in a manner which results in a denial or abridgment of the right ... to vote on account of race or color." 42 U.S.C. § 1973(a).[3]

## B.

The District argues that it is not a "political subdivision" within the meaning of § 2. While the language of § 2 does not expressly indicate its scope, the District's argument is inconsistent with the legislative history and judicial interpretations of § 2.

The Supreme Court first interpreted the term "political subdivision" in the context of § 5, which deals with preclearance of election procedures. *United States v. Sheffield Bd. of Comm'rs,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978). The Court noted that § 14 of the Act, 42 U.S.C. § 1973*l* (c)(2), defines "political subdivision" to mean "any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting," but rejected the notion that § 14 limits the scope of § 5. *Sheffield,* 435 U.S. at 126, 98 S.Ct. at 976. Instead, the Court explained, "[t]he language, structure, history, and purposes of the Act persuade us that § 5, like the constitutional provisions it is designed to implement, applies to all entities having power over any aspect of the electoral process within designated jurisdictions." *Id.* at 118, 98 S.Ct. at 972. The Court found that a broad reading of § 5 was required to implement fully the Congressional objectives underlying the Act. *Id.* at 117–18, 98 S.Ct. at 971–72. The Court therefore held that § 5 applied to

---

3. Section 2 provides in full:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

an Alabama city that did not register voters. *Id.* at 138, 98 S.Ct. at 982–83.

Section 5 and § 2 are closely related. *Chisom v. Roemer,* 501 U.S. 380, 401, 111 S.Ct. 2354, 2367, 115 L.Ed.2d 348 (1991). In *Chisom,* the Court held that § 2 applies to state judicial elections. *Id.* at 404, 111 S.Ct. at 2368–69. In so holding, the Court reiterated its conclusion in *Allen v. State Bd. of Elections,* 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969), that "the Act should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom,* 501 U.S. at 403, 111 S.Ct. at 2368. As in *Sheffield,* the Court based this holding on the Act's history:

> [T]he coverage provided by [pre-amendment] § 2 was unquestionably coextensive with the coverage provided by the Fifteenth Amendment; the provision simply elaborated upon the Fifteenth Amendment. Section 2 protected the right to vote, and it did so without making any distinctions or imposing any limitations as to which elections would fall within its purview.

501 U.S. at 392, 111 S.Ct. at 2362 (citation omitted). Moreover, while § 5 applies only to "covered" entities, § 2 applies nationwide. *See Baker v. Pataki,* 85 F.3d 919, 925 (2d Cir.1996) (en banc); *see also United States v. Uvalde Consol. Indep. Sch. Dist.,* 625 F.2d 547, 555 (5th Cir.1980). It therefore seems logical that § 2 should reach at least as far as § 5.

Section 2 has been applied to school board elections conducted by school districts that do not register voters. *See Uvalde,* 625 F.2d at 556; *see also Rollins v. Fort Bend Independent Sch. Dist.,* 89 F.3d 1205 (5th Cir. 1996). In *Uvalde,* the Fifth Circuit relied on *Sheffield* in holding that the school district was a "political subdivision" within the scope of § 2 and that § 2 was not constrained by the definition in § 14. *Uvalde,* 625 F.2d at 555–56. The court explained that limiting the scope of § 2 "would make it inapplicable to the actions of officials at polling places in hundreds of elections throughout the nation." *Id.* at 556 (citing *Sheffield,* 435 U.S. at 120–21, 98 S.Ct. at 973–74).

The legislative history of the 1982 amendments further indicates that Congress intended § 2 to apply broadly. In its report, the Senate Subcommittee on the Constitution expressed concern that:

> Every political subdivision in the United States would be liable to have its electoral practices and procedures evaluated by the proposed results test of section 2. It is important to emphasize at the outset that for purposes of section 2, the term "political subdivision" encompasses *all* governmental units, including city and county councils, school boards, judicial districts, *utility districts,* as well as state legislatures.

Report of the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, *included in* S.Rep. No. 417, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 324–25 (second emphasis added). In adopting the results test, the Senate Judiciary Committee responded at length to the Subcommittee report. However, the Committee did not revise the proposed amendments to limit § 2's application. *See id.* at 204–21. Nor did the amendments overrule *Uvalde*'s holding that the definition of "political subdivision" in § 14 does not limit § 2's application.

### C.

The District's status under Arizona law further supports our conclusion that it is covered by § 2. Under Arizona law, the District is a "public, political, taxing subdivision of the state, and a municipal corporation." A.R.S. § 48–2302. The parties stipulated that, pursuant to § 48–2302, the District is "an entity vested with all the rights, privileges and benefits granted to municipal corporations." The District exercises many governmental powers, including the power of eminent domain, the power to levy taxes on lands within its boundaries, and the power to issue tax-exempt bonds. A.R.S. §§ 48–2302, –2340, –2341(B), –2411 to –2415. The District's elected officials exercise these powers and have broad decision-making authority over the District's water and power functions.

To the extent it enjoys the powers and privileges of a political subdivision, the District also should bear the duties and obligations of a political subdivision. The fact that the District is a limited-purpose public entity makes it no less public. The District conducts elections according to statutory procedures. Its Directors and Council members are elected representatives who represent divisional or at-large constituencies and must "vie for popular support just as other political candidates do." *Chisom*, 501 U.S. at 400, 111 S.Ct. at 2367.

Furthermore, the District submits new election procedures to the Department of Justice for preclearance under § 5.[4] Were we to shield the District from compliance with § 2, we would sanction the anomalous situation in which the District could not change its voting system to discriminate on account of race or color but could not be forced to eliminate an existing discriminatory practice.

We therefore hold that the District is a political subdivision within the scope of § 2, whose electoral system may not abridge the rights of its electors to vote on account of their race or color. To the extent that it holds otherwise, we reverse the district court's decision.

4. The District does not agree with the Department of Justice that its elections should be covered by § 5. However, it has submitted voting changes for preclearance since 1976.

5. Congress amended § 2 to overrule the Supreme Court's holding in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), that both the Fifteenth Amendment and § 2 require proof of intentional discrimination.

6. The Senate Report identified the following factors as relevant to the "results" analysis under amended § 2:
   1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.
   2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
   3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

## D.

■ We now consider whether the District's land ownership voting qualification violates § 2.

■ As amended in 1982, § 2 prohibits voting qualifications which *result in* discrimination on account of race or color. Section 2 requires proof only of a discriminatory result, not of discriminatory intent.[5] *See Chisom*, 501 U.S. at 394, 111 S.Ct. at 2363 ("[P]laintiffs can prevail under § 2 by demonstrating that a challenged election practice has resulted in the denial or abridgment of the right to vote based on color or race."). Section 2(b) guides the courts in applying the "results test," providing that "a violation of [§ 2] is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens." 42 U.S.C. § 1973(b). In its report on the 1982 Amendments, the Senate Judiciary Committee articulated several "typical factors" courts should consider in examining the totality of circumstances in § 2 cases.[6]

   4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
   5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
   6. whether political campaigns have been characterized by overt or subtle racial appeals;
   7. the extent to which members of the minority group have been elected to public office in the jurisdiction;
   Additional factors ... are:
      whether there is a significant lack of responsiveness on the part of elected officials to the particularized need of the members of the minority group;
      whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.
   S.Rep. No. 97–417, 97th Cong., 2d Sess. (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07.

In order to make out a § 2 claim against the District, Appellants must establish that the land ownership requirement results in discrimination "on account of race or color." 42 U.S.C. § 1973. Several courts of appeal have rejected § 2 challenges based purely on a showing of some relevant statistical disparity between minorities and whites. The Third Circuit rejected the contention that Pennsylvania's voter-purge statute violated § 2 simply because more minority members than whites were inactive voters. *Ortiz v. City of Philadelphia Office of the City Comm'rs*, 28 F.3d 306, 315 (3d Cir.1994). The Fourth Circuit upheld Virginia's appointment-based school board system against a § 2 challenge despite a statistical disparity between the percentage of blacks in the population and the percentage of blacks on the school board. *Irby v. Virginia State Bd. of Elections*, 889 F.2d 1352, 1358–59 (4th Cir.1989). The Fifth Circuit rejected a § 2 challenge to an at-large voting system based exclusively on a statistical difference between Hispanic and white voter turnout. *Salas v. Southwest Texas Junior College Dist.*, 964 F.2d 1542, 1556 (5th Cir.1992). The Sixth Circuit rejected a § 2 challenge to Tennessee's felon-disenfranchisement law that rested primarily on the statistical difference between minority and white felony-conviction rates. *Wesley v. Collins*, 791 F.2d 1255, 1262 (6th Cir.1986).

█ These cases stand for the principle that a bare statistical showing of disproportionate *impact* on a racial minority does not satisfy the § 2 "results" inquiry. Instead, "[s]ection 2 plaintiffs must show a causal connection between the challenged voting practice and [a] prohibited discriminatory result." *Ortiz*, 28 F.3d at 312. Only a voting practice that results in discrimination gives rise to § 2 liability.[7]

In the instant case, the district court examined the totality of the circumstances to determine whether landowner-only voting results in discrimination against African–Americans on account of their race. The district court's inquiry was somewhat constrained by the parties' joint stipulation of facts; Appellants effectively stipulated to the nonexistence of virtually every circumstance which might indicate that landowner-only voting results in racial discrimination. In particular, the parties stipulated that:

84. There is no evidence that the landowner voting system of the District was originally established and has been maintained with any intent to abridge or deny any person's right to vote on account of race.

85. There is no known history or incident of racial discrimination in District elections.

86. The issues in District elections have historically been concerned directly with matters of reliability and economy of water storage and distribution and planning, operation, and economy of District power functions which support District water reclamation functions....

89. There is no history or incident of campaigning by any candidate in any dis-

---

7. Concurring in *Solomon v. Liberty County, Florida*, 899 F.2d 1012 (11th Cir.1990) (en banc), Chief Judge Tjoflat provided the following explication of "discrimination":

The term "discrimination" is not meaningless. The dictionary defines the term rather broadly as "the making or perceiving of a distinction or difference." Webster's Third New International Dictionary 648 (1961). In the context of the Civil War amendments and statutes enacted to enforce those amendments, the term historically has carried a much narrower definition: a classification, decision, or practice that depends on race or ethnic origin.... [A] scheme results in such classifications, decisions, or practices only when there is a conjunction ... of two things: (1) a voting scheme or process that allows racial bias to be expressed and (2) racial bias in the voting

community. If only the suspect scheme is present, without bias in the community, the scheme cannot, by definition, result in classifications, decisions, or practices based on race or color. Similarly, if only the bias is present, but the scheme does not allow that bias to be expressed or to work to dilute the minority voting strength, then there is simply no reason for the voting community to make classifications, decisions, or practices based on race or color....

As one student commentator, interpreting the phrase "discriminatory results," has argued, "Congress ... revised section 2 to prohibit election practices that accommodate or amplify the effect that *private discrimination* has on the voting process."

*Id.* at 1031–32 (Tjoflat, J., concurring) (citations omitted).

trict election based on racial appeals or on covert or subtle racial grounds.

90. No data has been maintained by the Defendants or is known to exist as to the races of candidates for the Board and Council [or] members of the Board and Council.... There is no history or incident of racially polarized voting in District elections.

91. The District's past and present election practices do not include practices which have the effect of enhancing opportunity for racial discrimination in voting behavior....

On these facts, there is no indication that African–American *landowners* (voters) are discriminated against in District elections. Furthermore, Appellants make no claim that the District's voting system discriminates against *non-landowners* (non-voters), who may disproportionately be African–Americans.

It is not our prerogative to reweigh the evidence on which the district court based its factual findings. *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). In assessing the totality of the circumstances, the district court applied the factors listed in the Senate Report. The court observed that the parties stipulated to the absence of circumstances which might indicate discrimination under virtually all of those factors.[8] The court also determined that Arizona has an important interest in landowner-based voting, since landowners have a greater stake than non-landowners in the District's operations and assumed the risk of financing the Association and District's original capital investment.

The real question this case presents is whether the land ownership requirement denies African–Americans the right and opportunity to vote in District elections. *See League of United Latin Amer. Citizens v. Clements,* 999 F.2d 831, 850 (5th Cir.1993) ("The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections ... extend only to defeats experienced by voters 'on account of race or color.' "), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). In light of the stipulated facts, the district court did not clearly err in finding that it does not. We therefore affirm the district court's finding that the statistical disparity in African–American and white home ownership does not prove that the District has violated § 2.

## IV. CONCLUSION

The District is a political subdivision to which § 2 applies. However, we agree with the district court that Appellants failed to prove that the District's land ownership voting qualification violates § 2. The district court asserted that applying § 2 to invalidate the District's land ownership voting requirement would exceed Congress's authority to enforce the Fifteenth Amendment. We decline to reach that constitutional issue, since it is unnecessary to our resolution of this case.

**AFFIRMED.**

---

8. Appellants suggest that the "Senate factors" apply only to "vote dilution" claims. To the contrary, the "totality of the circumstances" test established in § 2(b) was initially applied *only* in "vote denial" claims such as this. In *Thornburg v. Gingles,* the Supreme Court carefully examined the legislative history to reach the conclusion that § 2(b) and the Committee's explanatory factors apply to vote dilution claims as well. *Thornburg,* 478 U.S. at 43–46, 106 S.Ct. at 2762–2764.